¶ 169.
ANNETTE KINGSLAND ZIEGLER, J.
{concurring). I concur only in the court's conclusion to *594 affirm the decision of the court of appeals. I do not join the lead opinion for two reasons. First, the lead opinion does not sufficiently address the legislature's 2011 changes to Wis. Stat. § 907.02 (2009-10), which had significant effect on the admissibility of expert opinion testimony in Wisconsin. The legislature has now tightened the applicable standard. Second, the lengthy lead opinion does not adequately guide trial courts with regard to how they should apply Wis. Stat. § 907.02 (2013-14).[1] I write to clarify that § 907.02 has now changed the gatekeeping function of the trial court concerning the admissibility of expert testimony. Simply stated, the trial court now must adhere to and apply the heightened Daubert-Wis. Stat. § 907.02 standard. In my view, a best practice for trial courts and counsel is to create a detailed, complete record regarding why any particular expert's testimony meets the heightened scrutiny due under § 907.02. The trial court's determinations here are upheld under the facts of this case because the trial court did not erroneously exercise its discretion in admitting the testimony of Dr. Wener.
¶ 170. While I agree that this court should uphold the circuit court's decision to admit Dr. Wener's expert testimony at trial, I reach this conclusion in spite of the fact that the legislature tightened the standard of admissibility of expert opinion testimony when it amended Wis. Stat. § 907.02 (2009-10). The circuit court did not "appl[y] an improper legal standard or make[] a decision not reasonably supported by the facts of record" in admitting Dr. Wener's testimony, 118th St. Kenosha, LLC v. DOT, 2014 WI 125, ¶ 18, *595 359 Wis. 2d 30, 856 N.W.2d 486 (quoting 260 North 12th St., LLC v. DOT, 2011 WI 103, ¶ 38, 338 Wis. 2d 34, 808 N.W.2d 372), and its decision should be upheld. See id. I view the record below, however, as a "close call" which might not survive appellate review had this been a different case type.
I
¶ 171. We have recognized that the legislature amended Wis. Stat. § 907.02 (2009-10) in 2011 Wisconsin Act 2 in order "to adopt the Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), reliability standard as stated in Federal Rule of Evidence 702." 260 North 12th St., 338 Wis. 2d 34, ¶ 55 n.10. Allow me to provide background concerning the federal adoption of Daubert. Unlike in Wisconsin, where the Daubert standard heightened the level of scrutiny to apply to expert witnesses, in the federal system, Daubert loosened the standard for admission of expert testimony.
¶ 172. To begin with, while the federal rule, Rule 702, may "embod[y] a liberal standard of admissibility for expert opinions," Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005), it is liberal as compared to the standard it "superseded," namely the so-called Frye " 'general acceptance' test," Daubert, 509 U.S. at 585-87 (named for Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). See Nimely, 414 F.3d at 395-96. It is not liberal as compared to Wisconsin's prior test for admitting expert testimony.
¶ 173. Frye's "austere standard" "made 'general acceptance' [of the matter upon which expert scientific testimony is based] the exclusive test for admitting expert scientific testimony." Daubert, 509 U.S. at *596 585-86, 589. Daubert recognized that the Federal Rules of Evidence, on the other hand, did not mandate general acceptance, consistent with the Rules' "general approach of relaxing the traditional barriers to 'opinion' testimony." Id. at 588-89 (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988)).
¶ 174. In Wisconsin, however, there is no "traditional barrier []" á la Frye for the legislature's adoption of Rule 702 to "relax[]." See State v. Walstad, 119 Wis. 2d 483, 516, 351 N.W.2d 469 (1984) ("The Frye concept is alien to the Wisconsin law of evidence."). Wisconsin's prior standard of admissibility of expert evidence was considerably more accommodating than either the Frye test or Rule 702's standard. As stated, Frye's yardstick is "general acceptance." Rule 702 mandates, inter alia, that expert testimony be "based on sufficient facts or data" and "the product of reliable principles and methods" and that the expert testifying "reliably applfy] the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). In contrast, under the previous Wisconsin standard "questions of the weight and reliability of relevant evidence [were] matters for the trier of fact." State v. Fischer, 2010 WI 6, ¶ 7, 322 Wis. 2d 265, 778 N.W.2d 629. "[E]xpert testimony [was] generally admissible in the circuit court's discretion if the witness [was] qualified to testify and the testimony would help the trier of fact understand the evidence or determine a fact at issue." State v. Kandutsch, 2011 WI 78, ¶ 26, 336 Wis. 2d 478, 799 N.W.2d 865. This was a "low threshold." State v. Shomberg, 2006 WI 9, ¶ 67, 288 Wis. 2d 1, 709 N.W.2d 310 (Butler, J., dissenting) (citing State v. St. George, 2002 WI 50, ¶ 39, 252 Wis. 2d 499, 643 N.W.2d 777).
¶ 175. The fact that the legislature has added three new prerequisites to the admission of expert *597 testimony in Wisconsin means that it now requires more of a showing and further trial court analysis before expert testimony may be introduced. That the legislature now requires—in addition to its earlier mandates of a qualified expert and sufficiently helpful testimony, Kandutsch, 336 Wis. 2d 478, ¶ 26—testi-mony "based upon sufficient facts or data," testimony which is "the product of reliable principles and methods" and a witness who has "applied the principles and methods reliably to the facts of the case," Wis. Stat. § 907.02(1), suggests that trial courts must now be much more piercing in their evaluation of proffered expert testimony. The days of relatively easy admission of expert testimony into Wisconsin courtrooms are over. The trial courts' gatekeeping function has changed in light of § 907.02.
¶ 176. The Wisconsin legislature's adoption of the Daubert standard was part of a larger seemingly legislative reaction to Wisconsin Supreme Court decisions; one observer argues that "Act 2 generated the most significant changes in at least sixteen years to Wisconsin's civil litigation system by limiting the applicability of 'risk contribution' theory, capping punitive damages, and mandating damages for frivolous claims," "most drastically chang[ing] the areas of strict products liability and expert opinion testimony." Kristen Irgens, Comment, Wisconsin Is Open for Business or Business Just As Usual? The Practical Effects and Implications of 2011 Wisconsin Act 2, 2012 Wis. L. Rev. 1245, 1247 (2012) (footnotes omitted); see Honorable Diane S. Sykes, Reflections on the Wisconsin Supreme Court, 89 Marq. L. Rev. 723, 737-38 (2006) (arguing that certain "cases from the last term reflect a court quite willing to aggressively assert itself to implement the statewide public policies it deems to be most *598 desirable," and that "[t]he court is loosening the usual constraints on the use of its power, freeing itself to move the law essentially as a legislature would, except that its decisions are for the most part not susceptible of political correction as the legislature's would be").[2]
¶ 177. Previously this court has rejected the invitation to follow the Daubert approach taken in the federal courts with regard to expert testimony. See Fischer, 322 Wis. 2d 265, ¶ 7 ("[T]here is no reason for us to revisit [in this case] Wisconsin's well-established role for the circuit court where expert testimony is proffered. The law in Wisconsin continues to be that questions of the weight and reliability of relevant evidence are matters for the trier of fact. . . . We, therefore, decline to adopt a Daubert-like approach to expert testimony that would make the judge the gatekeeper."). Act 2 negates this decision, transforming Wisconsin law so that it now adheres to Federal Rule 702's heightened standard. To minimize the significance of this change, as the lead opinion might be read to do, contravenes the requirement of Wisconsin's Act 2, which clearly contemplates a more substantial burden on litigants who seek to have expert testimony admitted in Wisconsin courts.
¶ 178. Importantly, even after Daubert, trial courts retain substantial discretion in deciding whether to admit expert testimony. See, e.g., Kumho *599 Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999) ("[T]he test of reliability is 'flexible,[1] and Daubert's list of specific factors[3] neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." (quoting Daubert, 509 U.S. at 594)). Moreover, the question before this court in reviewing the circuit court's evidentiary decision below "is not whether this court agrees with the ruling of the trial court, but whether appropriate discretion was in fact exercised." Martindale v. Ripp, 2001 WI 113, ¶ 29, 246 Wis. 2d 67, 629 N.W.2d 698 (quoting State v. Wollman, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979)).
¶ 179. Given the foregoing, the facts of this current case might stand as a poor example to clearly illustrate the heightened standard of Wis. Stat. § 907.02. This court today decides that the court below did not erroneously exercise its discretion but does little to advise courts how to apply the new heightened standard to other cases involving different expert testimony. I note that, had the circuit court below *600 decided to exclude Dr. Wener's testimony, we would analyze that exclusion of evidence in light of the standard espoused in Daubert and the fact that we owe the circuit court erroneous-exercise-of-discretion deference. In this case, under these facts, involving this doctor's testimony, that deference due tips the scales in favor of the circuit court's detailed determination below.
1—1 1—1
¶ 180. In this medical malpractice case, the defense seeks to exclude the testimony of a medical doctor who is board certified in obstetrics and gynecology, who has delivered thousands of babies over three decades and confronted dozens of instances of shoulder dystocia, who taught medical students and residents in a clinical capacity for four years at the University of California, San Diego, and who served as chairman of the OB/GYN department at a hospital for 20 years, arguing that this expert cannot meet the Daubert standard as set forth in Wis. Stat. § 907.02. The above expertise is directly on point with the claim made here.
f 181. Wisconsin Stat. § 907.02(1) requires, for the admission of expert testimony: (1) that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"; (2) that the expert witness "testify [ing] thereto in the form of an opinion or otherwise" is "qualified as an expert by knowledge, skill, experience, training, or education"; (3) that the expert testimony is "based upon sufficient facts or data"; (4) that the expert testimony is "the product of reliable principles and methods"; and (5) that the expert witness "has applied the principles and methods reliably to the facts of the case." § 907.02(1).
*601 ¶ 182. Digging deeper into the facts specific to this case, Dr. Balink argues that Dr. Wener's testimony is not the product of reliable principles and methods, and that Dr. Wener did not apply the principles and methods he used reliably to the facts of the case. Dr. Balink contends that Dr. Wener's opinions are simply based on his own personal preferences rather than, for instance, on medical literature; criticizes Dr. Wener's so-called "holistic" approach; and points out supposedly contradictory or confusing aspects of Dr. Wener's testimony. All of these arguments could be well-developed in cross-examination. Argument could be made that such personal preference does not meet the legal definition of medical malpractice. The circuit court did not erroneously exercise its discretion in declining to exclude Dr. Wener's testimony. The trial court concluded that Dr. Wener's opinion was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."
¶ 183. Wisconsin Stat. § 907.02 uses, for example, two key terms relevant to this case: "methodD" and "principleD." See Wis. Stat. §907.02(1). A "method" is a "mode of organizing, operating, or performing something, esp. to achieve a goal." Method, Black's Law Dictionary 1141 (10th ed. 2014). A "principle" is a "basic rule, law, or doctrine; esp., one of the fundamental tenets of a system." Principle, id. at 1386. Generally speaking, Dr. Wener's method in providing the disputed expert testimony was, to quote the plaintiffs-respondents' brief, to "review the [relevant medical] records and provide an opinion based upon his education, training, and 36 years of experience" as to whether the steps taken and not taken by Dr. Balink in her care of Braylon and Kimberly Seifert met the applicable standard of care. More specifically, Dr. Wen- *602 er's application of his education, training, and experience to the facts of the Seiferts' case included consideration of a specific set of medical "principles," namely the various "risk factors" for shoulder dystocia present in the Seiferts' case. These principles suggested that "maternal obesity, excessive weight gain [in the mother], gestational diabetes [suspected through the result of blood glucose testing,] ... a large baby[,]" and use of a vacuum during delivery all increase the likelihood that shoulder dystocia will occur during delivery.
¶ 184. Moreover, the Wisconsin Jury Instructions state the standard used in a case involving alleged medical negligence like this one in part as follows:
In (treating) (diagnosing) {plaintiff)'s (injuries) (condition), (doctor) was required to use the degree of care, skill, and judgment which reasonable (doctors who are in general practice) (specialists who practice the specialty which (doctor) practices) would exercise in the same or similar circumstances, having due regard for the state of medical science at the time (plaintiff) was (treated) (diagnosed). A doctor who fails to conform to this standard is negligent. The burden is on (plaintiff) to prove that {doctor) was negligent.
A doctor is not negligent, however, for failing to use the highest degree of care, skill and judgment or solely because a bad result may have followed (his) (her) (care and treatment) (surgical procedure) (diagnosis). The standard you must apply in determining if Cdoctor) was negligent is whether {doctor) failed to use the degree of care, skill, and judgment which reasonable (general practitioners) (specialists) would exercise given the state of medical knowledge at the time of the (treatment) (diagnosis) in issue.
Wis JI—Civil 1023 at 1. Dr. Wener's conclusion was essentially that, given the presence of the risk factors discussed as evidenced by the facts of the case and the *603 medical records he studied, certain of Dr. Balink's actions and omissions—failure to perform additional glucose testing, for example—constituted unreasonable care because of the unjustified risk of shoulder dystocia. Clearly, cross-examination and argument could dispel the notion that Dr. Wener's conclusions are but one, and not a conclusive, reasonable standard of care.
¶ 185. The circuit court below indeed assessed the reliability of Dr. Wener's testimony as required by Wis. Stat. § 907.02(1). The circuit court explained, citing McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418 (D. Mass. 2008), that obstetrics "is a recognized field of expertise" as opposed to "junk science." See McGovern, 584 F. Supp. 2d at 424. The circuit court characterized Dr. Wener's method as "holistic" "clinical medical methodology," relying partly on Cooper v. Carl A. Nelson & Co., 211 F.3d 1008 (7th Cir. 2000), in which the Seventh Circuit —applying Daubert—noted the apparent agreement of the party seeking to exclude the expert testimony of three physicians that "in clinical medicine, the methodology of physical examination and self-reported medical history employed by [one of the experts] is generally appropriate." Cooper, 211 F.3d at 1020; see also, e.g., Reference Manual on Sci. Evid. 703 (3d ed.) ("A patient-physician encounter typically consists of four components: (1) patient history, (2) physical examination, (3) medical decisionmaking, and (4) counseling."). This approach was analogous to the one taken by Dr. Wener (although Dr. Wener's review was also retroactive). The circuit court observed that Dr. Wener's opinion was "based upon the facts of this case," and on "recognized factors subject to cross[- ] examination" such as Braylon's estimated size, Kimberly's weight gain, and the results of Kimberly's *604 glucose tests. Consequently, the court concluded that Dr. Wener's opinion was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."
¶ 186. The court tempered its conclusions by exploring various weaknesses in Dr. Wener's approach, stating, for instance, "[A] lot of things in medicine can't be tested because you can't repeat the exact same factors because every human body is different. And maybe that makes the defense's case ultimately." The court also acknowledged that there was some level of extrapolation in Dr. Wener's analysis. But there was a common thread running through the court's remarks: that although Dr. Wener's testimony was not perfect, it was "sufficiently reliable to be admitted."
¶ 187. Remaining in our required position in review of the record makes plain that the circuit court "applie[d] [the] Q proper legal standard [and] ma[de] a decision. .. reasonably supported by the facts of record." 118th St. Kenosha, 359 Wis. 2d 30, ¶ 18 (quoting 260 North 12th St., 338 Wis. 2d 34, ¶ 38). Dr. Wener's conclusions certainly could have been better supported. In particular, he could have done a better job of attempting to quantify the point at which a tolerable level of risk of shoulder dystocia becomes intolerable. In addition, Dr. Balink points to alleged errors and inconsistencies in Dr. Wener's testimony. But all of these deficiencies were able to be tested on cross-examination; they did not mandate exclusion of the entire expert opinion. The record substantiates a conclusion that Dr. Wener "adhere [d] to the same standards of intellectual rigor that are demanded in [his] professional work." Cooper, 211 F.3d at 1020 (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996)).[4]
*605 ¶ 188. Ultimately, and as suggested by the circuit court, this case does not involve "junk science," a "junk scientist," or a "junk opinion." McGovern, 584 F. Supp. 2d at 424. This was testimony in a "recognized field of expertise" as to the standard of care required, provided by a well-qualified physician who had delivered thousands of babies. Dr. Wener used his own education, training, and experience to review the relevant medical records and to reach a conclusion as to whether the applicable standard of care was followed. The circuit court did not err in admitting this testimony.[5]
*606 III
¶[ 189. Thus, I concur only in the court's conclusion to affirm the decision of the court of appeals. I do not join the lead opinion for two reasons. First, the lead opinion does not sufficiently address the legislature's 2011 changes to Wis. Stat. § 907.02 (2009-10), which had significant effect on the admissibility of expert opinion testimony in Wisconsin. The legislature has now tightened the applicable standard. Second, the lengthy lead opinion does not adequately guide trial courts with regard to how they should apply Wis. Stat. § 907.02. I write to clarify that § 907.02 has now changed the gatekeeping function of the trial court concerning the admissibility of expert testimony. Simply stated, the trial court now must adhere to and apply the heightened Daubert-Wis. Stat. § 907.02 standard. In my view, a best practice for trial courts and counsel is to create a detailed, complete record regarding why any particular expert's testimony meets the heightened scrutiny due under § 907.02. The trial court's determinations here are upheld under the facts *607 of this case because the trial court did not erroneously exercise its discretion in admitting the testimony of Dr. Wener.
¶ 190. While I agree that this court should uphold the circuit court's decision to admit Dr. Wener's expert testimony at trial, I reach this conclusion in spite of the fact that the legislature tightened the standard of admissibility of expert opinion testimony when it amended Wis. Stat. § 907.02 (2009-10). The circuit court did not "applfy] an improper legal standard or makef] a decision not reasonably supported by the facts of record" in admitting Dr. Wener's testimony, 118th St. Kenosha, 359 Wis. 2d 30, ¶ 18 (quoting 260 North 12th St., 338 Wis. 2d 34, ¶ 38), and its decision should be upheld. See id. I view the record below, however, as a "close call" which might not survive appellate review had this been a different case type.
¶ 191. For the foregoing reasons, I respectfully concur.

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 Compare, e.g., Thomas ex rel. Gramling v. Mallett, 2005 WI 129, ¶¶ 178-79, 285 Wis. 2d 236, 701 N.W.2d 523 (Wilcox, J., dissenting) (contending that the court's "expansion" of risk-contribution theory "amounts to an unwarranted and unprecedented relaxation of the traditional rules governing tort liability, and raises serious concerns of fundamental fairness"), with 14 Jay E. Grenig, Wisconsin Practice Series: Elements of an Action § 14:5, at 765 (2015-2016 ed.) (arguing that Act 2 "limits the holding of Thomas").

 In Daubert the Supreme Court "discussed certain. .. factors . . . some or all of which might prove helpful in determining the reliability of a particular scientific 'theory or technique.' " Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993)). The Daubert Court pointed to "whether [a theory or technique] can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error," and whether there is "general acceptance" of the matter within the "relevant scientific community." Daubert, 509 U.S. at 593—94 (quoting United States v. Downing, 753 F.2d 1224, 1238 (3d Cir. 1985)).

 In an amicus brief, the American Medical Association and *605 the Wisconsin Medical Society set forth their concern that:
If left uncorrected, the decisions of the lower courts would place an unreasonable burden on physicians, [because] . . . [i]n making decisions about how to treat their patients, .. . physicians . .. would have to account for the possibility that the preferences of a physician they have never met.. . could serve as the basis by which their conduct will be judged.
But this argument ignores the fact that the standard against which a physician's conduct is judged is the conduct of a similarly-situated reasonable physician. Wis JI—Civil 1023 at 1. And arguably "for any set of clinical facts, however unique, there are decisions or actions that virtually no doctor would find acceptable." Mark A. Hall, Mary Anne Bobinski & David Orentlicher Health Care Law and Ethics 321 (8th ed. 2013) (presenting idea without necessarily endorsing it). Physicians need only ensure that their conduct matches the conduct of a similarly-situated reasonable physician. Assuming that a judge finds that expert testimony passes the requirements of Wis. Stat. § 907.02, the party against whom the testimony is offered may dispute it by cross-examination and by presenting contrary expert testimony suggesting that the party's conduct was reasonable. It is then up to the jury to decide which set of testimony is more believable.

 I reject Dr. Balink's remaining arguments for reversal. Without opining on whether, or the extent to which, the *606 Seiferts' attorney violated various pretrial orders, and without opining on the possibility that Dr. Balink has waived this argument, I conclude that the record does not establish that, because of comments made by the Seiferts' attorney during closing arguments following this week-long jury trial, "the verdict reflects a result which in all probability would have been more favorable to the complaining party but for the improper argument." Wagner v. Am. Family Mut. Ins. Co., 65 Wis. 2d 243, 250, 222 N.W.2d 652 (1974) (citing Klein v. State Farm Mut. Auto. Ins. Co., 19 Wis. 2d 507, 510 n.1, 120 N.W.2d 885 (1963)). The circuit court did not erroneously exercise its discretion in declining to grant a new trial. See id. at 249-50.
Further, given the conclusions set forth in this writing, discretionary reversal is not warranted. See Wis. Stat. § 751.06.

 The Honorable Craig R. Day presided.